UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SHELIA YATES-MATTINGLY | : | Case No. 1:11-cv-753 |
| Plaintiff, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| PAMELA D. LINEBACK, | : | |
| Defendant. | : | |

## ORDER: (1) DENYING PLAINTIFF'S MOTION TO STRIKE (Doc. 77); (2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 70); and (3) CLOSING THIS CASE UPON ENTRY OF JUDGMENT

This civil action is before the Court on: (1) Plaintiff's motion to strike (Doc. 77) and the parties' responsive memoranda (Docs. 82, 83) and (2) Defendant's motion for summary judgment (Doc. 70) and the parties' responsive memoranda (Docs. 74, 80).[1]

## I. UNDISPUTED FACTS[2]

1. UC is a state university created by the Ohio General Assembly, which has a branch campus in Blue Ash, Ohio known as Blue Ash College ("UCBA"). (Ohio Rev. Code § 3361.06; Doc. 64 at 83).

2. Plaintiff Shelia Yates-Mattingly is Caucasian, as is Defendant Lineback, her former supervisor. (Doc. 61 at 11).[3]

---

[1] Plaintiff requests oral argument on this motion. (Doc. 21). Local Rule 7.1(b)(2) anticipates oral argument only if it is "deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented." Here, the Court finds, however, that the pleadings are clear on their face and that oral argument is not necessary. *See also Whitescarver v. Sabin Robbins Paper Co.*, Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D. Ohio July 27, 2006) (J. Dlott) ("Local Rule 7.1(b)(2) leaves the Court with discretion whether to grant a request for oral argument.").

[2] *See* Docs. 72 and 74-2.

[3] Plaintiff denies any inferences in favor of Defendant that Lineback would not discriminate against Plaintiff on the basis of her race.

3. Yates-Mattingly began working as UCBA's Coordinator of Student Life in June 1998.  (Doc. 61 at 52, Ex. O).

4. Lineback served as Yates-Mattingly's direct supervisor from December 1, 2002 through June 14, 2010, when Yates-Mattingly was terminated.  (Doc. 64 at 37; Doc. 61 at 73-74).[4]

5. Lineback gave Yates-Mattingly positive performance reviews during her early years.  (Doc. 61 at 74-85, Exs. X, W).[5]

6. Plaintiff, while continuing her full-time position of employment at UCBA, became a graduate student at UC.  (Doc. 61 at 85).[6]

7. Plaintiff's annual Performance Review in June 2008 was positive, but Lineback instructed her to take graduate courses in the evenings so that she would not be away from the office during regular working hours.  Lineback also cautioned her about the need to be more patient with colleagues.  (Doc. 61 at 189-192; Doc. 64 at 66).[7]

8. During 2008, an informal survey of faculty advisers to student organizations at UCBA revealed dissatisfaction with the lack of access to employees in the Student Life office, an unwelcoming attitude, and poor communications by Yates-Mattingly and her assistant.  (Doc. 71 at ¶ 1, Ex. A).[8]

---

[4]  Plaintiff denies the inference that Lineback's positive performance reviews establish that Lineback would not discriminate against Plaintiff.

[5]  Plaintiff denies the inference that Lineback's positive performance reviews establish that Lineback would not discriminate against Plaintiff.

[6]  Plaintiff denies that these classes played any role in her termination insofar as the overwhelming majority of them occurred after 4:00 p.m.  Plaintiff alleges that she had permission to take these classes and was encouraged by UC to do so and continued to earn positive reviews while taking them.

[7]  Plaintiff denies that these classes played any role in her termination insofar as the overwhelming majority of them occurred after 4:00 p.m.

[8]  Plaintiff denies that this survey, which occurred two years prior to her termination and before her favorable June 2008 review, motivated the termination decision as Lineback did not reference it in the PIP or any of the documents justifying termination.  (Doc. 61, Ex. LL; Doc. 64, Ex. 39, Doc. 64 at 258-259).

9. In Yates-Mattingly's annual Performance Review in 2009, Lineback lowered Yates-Mattingly's ratings in five of the six categories in which she was evaluated as compared with 2008. Lineback concluded that Yates-Mattingly did not meet job requirements in "Communication" and commented on her poor attendance and demeanor. (Doc. 64 at 205-209, Ex. 26).[9]

10. Between January 2007 and October 2009, Lineback documented six different occasions when she verbally counseled Plaintiff on performance issues including her need to keep a visible presence in the office, her need to work standard hours, and variances between her time sheet and work hours. (Doc. 61 at 196-197; Doc. 64 at 194-199, 209-211, Exs. 22, 27).[10]

13. In Fall 2009, Yates-Mattingly taught four courses as a term adjunct instructor in UC's School of Education, which is part of the College of Education, Criminal Justice and Human Services ("CECH"). (Doc. 61 at 146-147, 155; Exhibit DD).[11]

14. Around February 2010, an anonymous complaint about Yates-Mattingly was made to a UC hotline called Ethics Point accusing Plaintiff of absenteeism, tardiness, and poor interpersonal communications. (Doc. 64 at 40, 211-213, Ex. 28).[12]

15. Upon receipt of the Ethics Point report, UC's top-ranking Human Resources official directed Lineback to consult with UC Human Resources ("HR") officials about establishing a Performance Improvement Plan ("PIP") for Yates-Mattingly.

---

[9] Plaintiff admits that Lineback included these scores on the review but denies the basis in fact for the attendance and demeanor comments insofar as Lineback was aware of Plaintiff's debilitating migraines which required her to sometimes report to work after her set arrival time. Plaintiff also notes that her duties often took her out of the office. (Doc. 64, Ex. 12; Doc. 64 at 32, 67-68, 139, 140; Doc. 61 at 97; Doc. 62 at 192-193, Ex. LL).

[10] Plaintiff denies these allegations insofar as she continued to receive positive performance evaluations. Additionally, Lineback was aware, at least by April 2008, of Plaintiff's debilitating migraines. (Doc. 64, Ex. 12; Doc. 61, Ex. LL).

[11] Plaintiff denies that these classes motivated the termination decision as most of them were either in the evening, online, or at Blue Ash. Also, Plaintiff rescheduled classes as needed to complete her duties. (Doc. 61, Exs. DD at 206, 207, 211-214; Doc. 62 at 207).

[12] Plaintiff denies this statement insofar as Lineback admitted that any complaint was unreliable due to the possibility that the individual wanted to cause trouble for Plaintiff and included a complaint that Lineback rejected immediately. (Doc. 64 at 213-214).

(Doc. 64 at 40).[13]

16. In March or April 2010, Lineback placed Yates-Mattingly on a PIP which required her to work 8:00 a.m. to 5:00 p.m. every day, notify her supervisor within one-half hour if she anticipated arriving to work late or needed to leave work early, and to leave a message or voice mail if Lineback was unavailable. (Doc. 62 at 210, Ex. QQ; Doc. 64 at 147).[14]

19. During the PIP, two mandatory orientation meetings were held for UCBA's Student Affairs staff. Yates-Mattingly failed to attend either of them. (Doc. 62 at 249-251).[15]

20. In early June 2010, Lineback communicated to HR that she wished to terminate Yates-Mattingly. (Doc. 64 at 241-242, 258-266, Exs. 36, 37).

21. Lineback's recommendation of termination received the approval of UC's HR Service Center and Labor Relations unit. (Doc. 65 at 115, 120, 128, Ex. 16).[16]

22. Yates-Mattingly was terminated on June 14, 2010 for non-compliance with the PIP. (Doc. 62 at 254, Ex. III; Doc. 64 at 270-71, Ex. 40).[17]

24. In June 2011, Lineback hired Marcus Langford, who is African-American, to the newly-created Director of Student Life position which included more supervisory

---

[13] Plaintiff denies this statement insofar as Lineback admitted that any complaint was unreliable due to the possibility that the individual wanted to cause trouble for Plaintiff and included a complaint that Lineback rejected immediately. (Doc. 64 at 213-214).

[14] Plaintiff denies any inference that she did not follow these requirements. (Doc. 64, Ex. 11; Doc. 62 at 222-225, 228, 229-230, 235-237, 241-242, 246, 247, 248, 249-250).

[15] Plaintiff claims that she was unable to attend the first meeting because of a student emergency and she could not attend the makeup meeting because Lineback scheduled a meeting with her for the same time. (Doc. 62 at 249-250).

[16] Plaintiff admits to the requirement, but denies that any meaningful review occurred.

[17] Plaintiff admits the termination, but denies that she failed to comply with the PIP.

duties than Yates-Mattingly had as Coordinator.  (Doc. 64 at 18-20).[18]

25. Another new position, Coordinator of Orientation, was also created within UCBA's Student Life Office in 2011 and Sarah Meagher, who is Caucasian, was appointed to the position.  (Doc. 71 at ¶ 9).[19]

26. Helen Kegler, who is African-American, was UCBA's Multi-Cultural Affairs Coordinator during all relevant periods, and reported directly to Lineback.  (Doc. 62 at 258-260).

27. Lineback at one time placed Kegler on a PIP due to her problems with interpersonal communications and collaboration with others; upon its completion, Kegler was found to have complied with the PIP.  (Doc. 64 at 43-49).[20]

28. No problems regarding Kegler's arriving to work on time, attendance, or reporting of leave time were ever brought to Lineback's attention and no high-ranking UC HR official ever directed Lineback to place Kegler on a PIP.  (Doc. 71 at ¶¶ 6, 7).[21]

29. Doran Brock, who is African-American, held the position of Senior Enrollment Services Counsel at UCBA.  (Doc. 62, Ex. OO).

30. Brock reported directly to Christopher Powers, who deemed it satisfactory for Brock to make up for his late arrivals at work in the morning by working extra hours in the evening.  (Doc. 64 at 58-59).

---

[18] Plaintiff denies the statement insofar as witnesses admit that Langford replaced Plaintiff and Lineback did not proceed through the abolishment or reorganization procedures for changing the positions.  (Doc. 69 at 30-31; Doc. 65 at 103, 132, 133, 134-135).

[19] Plaintiff denies the statement insofar as witnesses admit that Langford replaced Plaintiff and Lineback did not proceed through the abolishment or reorganization procedures for changing the positions.  (Doc. 69 at 30-31; Doc. 65 at 103, 132, 133, 134-135).

[20] Plaintiff admits the PIP but denies that Kegler, whom Lineback believed "played the race card" to avoid discipline, complied with the PIP because Lineback admits that her performance deteriorated and her interpersonal issues remained a "work in progress."  (Doc. 64 at 43, 44, 45, 47-49, 50, 51-52, 87-89, 173).

[21] Plaintiff denies that the alleged ethics complaint motivated the termination decision because Lineback admits the possibility that the individual wanted to cause trouble for Yates-Mattingly and included a complaint that Lineback rejected immediately.  (Doc. 64 at 213-214).

31. Yates-Mattingly and her friends at UCBA perceived that Lineback gave favorable treatment to several Caucasian employees, including Christopher Powers, Tresha Lewis, Carly Dennis, Ashley Sallee, Tiffany Williams, Abby Sennett, and John Kraimer.  (Doc. 68 at 68-70; Doc. 61 at 130; Doc. 69 at 33-38).[22]

32. On November 17, 2010, Yates-Mattingly filed a charge with the Equal Employment Opportunity Commission ("EEOC") in which she alleged that UC terminated her from the Student Life Coordinator position because of her age and disability.  (Doc. 61 at 25-27, Ex. J).[23]

33. In an affidavit that Yates-Mattingly submitted to the EEOC in support of her November 17, 2010 charge, she identified five Caucasian individuals whom she alleged were similarly situated and were treated better than she was.  (Doc. 61 at 25-27, Ex. J at 1, No. 6).[24]

34. Holly Johnson, the former Director of UC's School of Education, during all relevant periods had final decision making authority regarding the appointment of individuals to teach courses within the School of Education.  (Doc. 73 at ¶¶ 1, 2).

35. Johnson preferred using a full-time UC faculty member to teach a course when he or she knew the subject matter and had capacity to teach it.  (Doc. 73 at ¶ 4).

36. Johnson also gave preference in the assignment of teaching courses to Graduate Teaching Assistants within CECH, who were paid a stipend with the expectation that they would teach.  (Doc. 73 at ¶ 4).

37. Typically, only if a full-time faculty member or Graduate Teaching Assistant was unavailable to teach a course in the School of Education would Johnson opt to use a term adjunct instructor to teach the course.  (Doc. 73 at ¶ 4).

---

[22]  Plaintiff denies this statement insofar as it is based on inadmissible hearsay testimony offered by witnesses who were not close "friends" of Plaintiff and/or who did not have close contact with Lineback.  (Doc. 69 at 12-13, 32-33, 60).

[23]  Plaintiff admits the EEOC charge, but denies its relevance.

[24]  Plaintiff denies this statement insofar as Plaintiff's EEOC charge answered the question as to which younger and/or nondisabled individuals were treated more favorably than her.  The question did not focus on race.  (Doc. 61, Ex. J at 1).

38. Term adjunct instructors received contracts for specific classes during specific terms, and had no guarantee to teach beyond the individual terms for which they contracted. (Doc. 61 at 5; Ex. DD; Doc. 73 at ¶ 5(A)).

39. For the two courses in which Yates-Mattingly had adjunct teaching experience, EDST 633 and EDST 710, other than Yates-Mattingly, only one term adjunct instructor, Maria Palmieri, was appointed to teach a class in the UC School of Education during the time period from November 2010 through Spring 2012. (Doc. 73 at ¶ 5(A)-(J)).

40. Palmieri was appointed to teach EDST 633 as an adjunct in the Winter Quarter of 2012 because Johnson was actively recruiting her for a full-time position at CECH -- a position that Palmieri received in May 2012. (Doc. 73 at ¶ 5(H)).

41. In September 2011, when Johnson made the decision to have Palmieri teach EDST 633 in the Winter Quarter of 2012, Johnson was unaware that Yates-Mattingly had filed a charge with the EEOC or a lawsuit involving her termination from UCBA. (Doc. 73 at ¶¶ 5(H), 7).

42. On April 9, 2012, Yates-Mattingly filed a second EEOC charge in which she alleged, among other things, that UC retaliated against her for filing her first EEOC charge, by terminating her from adjunct instructor positions. (Doc. 61 at 30-31, Ex. L).

43. Johnson first became aware that Yates-Mattingly had filed her first EEOC charge and a lawsuit regarding her termination from UCBA in April 2012, when she was asked to provide information in response to Yates-Mattingly's second EEOC charge. (Doc. 73 at ¶ 7).

44. After Yates-Mattingly filed her first EEOC charge in November 2010, she continued teaching as a term adjunct instructor; she taught EDST 633 in both the Winter Quarter of 2011 and Spring Quarter of 2011. (Doc. 73 at ¶ 5(D), (E)).

45. After Yates-Mattingly filed her first EEOC charge in November 2010, UC hired her for two additional positions of employment: Assessment and Evaluation Coordinator for UC's Evaluation Services Center from July 2011 through June 2012, and Supplemental Educational Services tutor for the Department of Supplemental Educational Services from January 2012 through April 2012. (Doc. 61 at 38-42 and 47-50).

## II.    STANDARD OF REVIEW

### A.  Motion to Strike

Federal Rule of Civil Procedure 12(f) permits a Court to strike from a pleading matters that are "redundant, immaterial, impertinent, or scandalous."  Motions to strike are addressed in the sound discretion of the trial court, but are generally disfavored. *Ameriwood Indus. Int'l Corp. v. Arthur Andersen & Co.*, 961 F. Supp. 1078, 1083 (W.D. Mich, 1997).  Striking pleadings is considered a drastic remedy to be used sparingly and only when the purposes of justice so require.  *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953).  "A motion to strike should be granted only when the pleading stricken has no possible relation to the controversy."  *Id.*

### B.  Motion for Summary Judgment

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## III.    ANALYSIS

To prove a Section 1983 claim, plaintiff must establish that defendant both acted under color of state law and deprived the plaintiff of a right secured under federal law. *Handy-Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012). Defendant concedes that Lineback, as an assistant dean at a state university, acted under color of state law. However, Defendant maintains that Plaintiff cannot prove that Lineback deprived her of her rights guaranteed by the Equal Protection Clause.

To allege a *prima facie* case of discrimination in a typical case, a plaintiff must assert that she: (1) is a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment decision; and (4) was replaced by a non-protected employee. *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001). In a reverse discrimination case, where a member of a racial majority alleges racial discrimination, the first and fourth prongs of the test are different. *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 604 (6th Cir. 2003). [25] Under the first prong, the

---

[25] Plaintiff objects to the Sixth Circuit's modified *prima facie* case as unfairly imposing a heightened standard in reverse discrimination. However, the Court is bound by the Sixth Circuit case law, which recently declined to reexamine the modified *prima facie* case. *Highfil v. City of Memphis*, 425 Fed. Appx. 470, 473 (6th Cir. 2011). In support of her argument against a heightened standard, Plaintiff cites *Murray v. Thistledown Racing Club, Inc*., 770 F.2d 63, 67 (6th Cir. 1985). However, the 1985 decision in *Murray* was clearly superseded by both *Treadwell v. Am. Airlines, Inc.*, 447 Fed. Appx. 676 (6th Cir. 2011) and *Highfil*.

9

plaintiff "must demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority."  *Id*. at 614. To satisfy the fourth prong, the plaintiff "must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." *Id.*[26]

### A. Discrimination Against the Majority

First, Plaintiff must "demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority."  *Morris v. Family Dollar Stores of Ohio, Inc*., 320 Fed. Appx. 330, 339 (6th Cir. 2009).  Such background circumstances can be established through evidence of the employer's unlawful consideration of race in the past to justify "a suspicion that incidents of capricious discrimination against whites because of their race may be likely." *Zambetti v. Cuyahoga Cmty. College*, 314 F.3d 249, 255 (6th Cir. 2002).  Alternatively, Plaintiff can show background circumstances by demonstrating that the employer was a member of the same minority race as the employees whom he allegedly favored.  *Morris,* 320 Fed. Appx. at 340, n. 11.

Most of the decisionmakers and contributors to Plaintiff's termination were not African-American.  Lineback is Caucasian.  When Plaintiff was initially hired, both the

---

[26] This Court previously held that in a reverse race discrimination matter, the *prima facie* case does not include a "replaced by" element. *Grindstaff v. Sun Chem. Corp*., No. 1:09cv450, 2010 U.S. Dist. LEXIS 123426, at *36-37 (S.D. Ohio Nov. 22, 2010).  This Court reaffirms that holding here.

UCBA's Dean and Assistant Dean to whom Plaintiff reported were Caucasian. At the time of her termination, the Interim Dean was Caucasian. Deborah deGroot-Osswald, the Human Resources official who guided Lineback through the final stages of the termination, and Lauren Lantz, the Labor Relations employee whom deGroot-Osswald consulted about the termination, both are Caucasian. Frank Wray, the faculty member who oversaw the 2008 survey of faculty advisers which was highly critical of Plaintiff, is also Caucasian.

In fact, there is evidence that Lineback was observed to have "favorites" who were Caucasian. Deborah Herrick, who is Caucasian and was a direct report to Lineback and later to Christopher Powers observed that Powers, who is Caucasian, received preferential treatment from Lineback. For example, Herrick testified that Lineback would meet with Powers more than she would meet with other directors. (Doc. 68 at 68-69). Herrick also testified that Tresha Lewis, who is Caucasian and was a direct report to Lineback, "seemed to have an open schedule of coming and going that other people weren't able to have." (Doc. 68 at 70). In fact, Plaintiff testified that she agreed with Herrick's observations that Powers and Lewis received preferential treatment. (Doc. 61 at 27-28). Plaintiff also observed that John Kraimer, a direct report to Lineback who is Caucasian, "came and went as he pleased." (*Id.* at 130). Moreover, in her initial complaint of discrimination with the EEOC regarding her termination, Plaintiff identified five Caucasians and no African-Americans as having been treated better than she was. (Doc. 61, Ex. J).

Sandra Parker, UCBA's Director of Institutional Research, confided with Plaintiff, Herrick, Kegler, and several others in UCBA's Student Affairs Department.  Herrick opined to Parker that Lineback had favorites whom Parker referred to as her "team of fair haired children."  (Doc. 69 at 34-35).  Parker identified the "fair haired children" as Powers, Lewis, Carly Dennis, Ashley Sallee, Tiffany Williams, and Abby Sennett, all of whom are Caucasian.  (*Id.* at 53).

Plaintiff viewed Helen Kegler, who is African-American, as receiving favorable treatment, but this view was not shared by her colleagues.  Parker did not perceive Kegler as one of Lineback's favorites.  (Doc. 69 at 35).  Kegler, in fact, had expressed to Parker that "if you weren't one of Pam's favorites, that she was basically looking for an excuse to get rid of [you]."  (*Id.* at 39).  Kegler told Parker that she believed Lineback favored Caucasians.  (*Id.* at 56).

Plaintiff argues that Lineback's belief that Helen Kegler, who is African-American, was quick to pull the "race card" constitutes evidence that Lineback is the unusual employer who discriminates against Caucasians.  However, this argument has been rejected by other courts.  *See, e.g., Gooden v. Ryan's Restaurant Group, Inc*., No. 5:04cv179, 2007 U.S. Dist. LEXIS 19336, at *9 (W.D. Ky. 2007) (rejecting plaintiff's argument that comments created background circumstances that the defendant was the unusual employer who discriminated against the majority: "You're a white male; she is a black female.  And the company feels that they face less risk of being sued if we fire you than if we fire someone that we know plays the race card.  We've told you before she

12

plays the race card.  You've been told to leave her alone, and the company just feels like it faces more of a danger of a suit, more risk by terminating her than terminating you."). The court in *Gooden* was persuaded in part by the fact that the employer had disciplined the African-American female accuser in the past, thus negating the plaintiff's argument that the employer had a policy of not disciplining African-American employees.  *Id.* at 10, 24.  The court also noted that plaintiff failed to mention race discrimination in his filings with the EEOC.  *Id.* at 24.

In the instant case, Lineback did not make any comments nearly as explicit as the manager in *Gooden*.  When Lineback was questioned about the effect of Plaintiff's African-American comparator, Helen Kegler, raising racial issues, Lineback stated "[t]here was probably always a slight concern, but not enough to deter."  (Doc. 64 at 52). Since the blatant statement in *Gooden* that the employer was disinclined to terminate an African-American who played the "race card" was not evidence of an unusual employer who discriminates against the majority, Lineback's comment on the issue – in which she claimed that Kegler's playing the "race card" did not affect how Lineback supervised her – certainly is not.  Also synonymous with *Gooden*: (1) Lineback had disciplined Kegler in the past through a Performance Improvement Plan; and (2) Plaintiff failed to mention race discrimination in her filings with the EEOC.

Accordingly, Plaintiff failed to allege background circumstances to support the suspicion that Defendant is the unusual employer who discriminates against the majority.

13

### B. Whether a Similarly Situated African-American Employee Received Favorable Treatment

Even if there were an issue of fact regarding the first element, Plaintiff fails to satisfy the fourth element, by alleging that a similarly-situated employee of a different race received preferable treatment.

#### 1. Helen Kegler

Helen Kegler, who is African-American, reported directly to Lineback.  (Doc. 61 at 258-60).  Kegler was subject to the same attendance standards as Plaintiff.  (Doc. 64 at 34, 120-21).  However, Lineback never observed Kegler abusing them.  When Lineback worked in the same suite as Kegler, she observed that Kegler consistently came to work at 8:00 a.m. every day and worked until 5:00 p.m., except on Fridays.  Kegler was "scrupulous" about reporting her time away from the office.  (*Id.* at 120).[27]  Even after Kegler relocated to the suite she shared with Plaintiff, no one brought to Lineback's attention any tardiness, absenteeism, or time reporting issues concerning Kegler.  (Doc. 71 at ¶ 6).[28]

---

[27]  Unlike Plaintiff, Kegler was never the subject of a complaint to Karen Faaborg or any other high-ranking UC Human Resources official.  Lineback testified that the Ethics Point complaint led her to follow through with a written PIP for Plaintiff which, in turn, led to the termination. Plaintiff failed to identify that any African-American employee, who was the subject to an Ethics Point or similar complaint, was treated better than she was.  There is no evidence to suggest that had a similar report been made about Kegler, Lineback would not have followed the same course that she did with Plaintiff.  (Doc. 71 at ¶ 7).

[28]  To the extent that Plaintiff claims she observed problems of this nature with Kegler, Plaintiff's observations are not relevant.  *Oliver v. St. Luke's Dialysis, LLC*, 491 Fed. Appx. 586 (6th Cir. 2012).

Both Plaintiff and Kegler were placed on PIPs.  However, Kegler complied with all aspects of her PIP and Plaintiff did not.  While Kegler's performance started to decline around the time UC was about to terminate Plaintiff, Plaintiff nonetheless continued to be a "more difficult employee."[29]  (Doc. 64 at 48).  While Plaintiff and Kegler both had interpersonal communication issues, Kegler's issues were significantly less serious than Plaintiff.  Lineback describes Kegler's demeanor as "meek" about 90 percent of the time, whereas Plaintiff was "considerably more strident."  (*Id.* at 91-92).  Plaintiff's heavy-handed and dismissive attitude toward colleagues made collaboration difficult, and a large number of coworkers were reluctant to work with her.  (*Id.* at 91-101).  Plaintiff's aggressiveness intensified during the final two years of her employment.  (*Id.* at 96).  Employees whose performance issues are of different levels of seriousness are not similarly situated.  *Cameron v. State of Ohio*, 344 Fed. Appx. 115, 118-119 (6th Cir. 2009).

The fact that Lineback did not treat Plaintiff and Kegler identically does not prove that disparate treatment occurred.  For example, Lineback testified that she enlisted the support of Alecia Trammer from the Human Resources Department and former UCBA Dean Dolores Straker, who are African-American, when she disciplined Kegler in hopes

---

[29]  Plaintiff argues that Kegler's poor performance issues were resurfacing at the time Lineback was engaged in the final steps to terminate Plaintiff.  Accordingly, Plaintiff suggests that UC should have either terminated both of them or neither of them.  However, evidence in the record shows that Lineback proceeded slowly with disciplinary issues, as evidenced by the long lapse of time between her initial warnings to Plaintiff in 2007, to the low performance evaluation she gave Plaintiff in 2009, to the PIP in early 2010.  Kegler's slip in performance around June 2010 following a lengthy improvement period did not justify termination.

that it might steer the focus away from race issues and toward performance issues.  (Doc.

64 at 50).  When asked how Kegler's focus on race issues affected her decision making,

Lineback testified:

> Q. Did you treat Sheila differently than Helen Kegler?
>
> A. I treated everyone different from everyone else.
>
> Q. In what ways did you treat Sheila differently than Helen?
>
> A. I'm not sure how to answer that, that's a big question.  You know, each individual person interacts with me differently, so I interact with each individual uniquely.
>
> Q. Did you apply the same performance standards for Sheila as you did Helen Kegler?
>                   …
> A. I used the same performance evaluation tool for both of them.  Their positions were sufficiently different that it's hard for me to answer your question.
>
> Q.  Well, what about with respect to attendance, did you apply the same standards to Helen as you did to Sheila Yates-Mattingly?
>
> A.  Yes.

(Doc. 64 at 33-34).  This testimony illustrates that in relevant matters, Lineback treated

Plaintiff and Kegler similarly.[30]

Plaintiff's argument that she was treated differently than employees who were not

on a PIP is irrelevant.  Plaintiff continually cites to practices that applied to employees

who were not on a PIP – for example, working through lunch and flex time – and argues

that since she followed some of those general practices when she was on a PIP, UC did

---

[30]  Plaintiff claims that Lineback required her to complete "elaborate" time sheets, but did not require Kegler to do so.  (Doc. 74 at 9).  However, Lineback testified that Kegler was required to complete the same sick and vacation logs as Plaintiff.  (Doc. 64 at 120-121).

16

not have legitimate reasons to discipline her.  (Doc. 74 at 3, 16, 32).  However, during a

PIP, a supervisor could require a set schedule: "[w]hatever your established hours are,

you would be expected to work during those standard hours, whatever those hours would

be." (Doc. 65 at 84).  Lineback let Plaintiff choose the standard hours she would work

and Plaintiff chose 8:00 a.m. to 5:00 p.m.  However, Plaintiff repeatedly failed to work

those hours, insisting that as long as UC got its 40 hour week, she was in compliance

with the PIP.

Ultimately, the Court finds that because Kegler complied with her PIP without

tardiness, attendance, and time reporting problems, she was not similarly situated to

Plaintiff.

### 2. *Doran Brock*

Plaintiff also identifies Doran Brock as a similarly-situated employee who

received favorable treatment.  Brock held the position of Senior Enrollment Services

Counsel at UCBA, in which he counseled students on financial aid issues.  (Doc. 61 at

262, Ex. OO).  He reported directly to Christopher Powers, who is Caucasian.  Powers

reported to Lineback that Brock had trouble getting to work on time, but Powers made

adjustments by letting him work into the evenings, which was conducive to his position.

(Doc. 64 at 58-59).  Lineback discussed possible discipline for Brock, but Powers

concluded that by allowing him to flex his time, good results could be achieved.  (*Id.* at

60-61).

Brock held a position with different responsibilities, reported to a different supervisor, and by his supervisor's estimation could adjust his work hours by working evenings to make up for late arrivals, thus he was not similarly situated to Plaintiff.  In contrast, Plaintiff was regularly reminded by Lineback about her need for "face time" during regular business hours and Lineback did not deem evening work to be an operationally sufficient substitute for Plaintiff.

Accordingly, Plaintiff failed to evidence that a similarly-situated employee of a different race received preferable treatment.

### C.  Legitimate, Nondiscriminatory Reasons For Termination and Pretext

Even assuming Plaintiff could establish a *prima facie* case of race discrimination, which she cannot, Plaintiff cannot demonstrate that the legitimate, non-discriminatory reasons for her termination were a pretext for race discrimination.  Once an employer presents a legitimate, non-discriminatory reason for discharge, the plaintiff bears the burden of showing that the proffered reasons were a pretext for impermissible discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The ultimate burden of persuasion remains with Plaintiff.  An employee's opinion that he did not perform poorly is irrelevant to establishing pretext where the employer reasonably relied on specific facts before it indicating that the employee's performance was poor. *Majewski v. Automatic Data Processing*, 274 F.3d 1106, 1117 (6th Cir. 2001).

Plaintiff was terminated because of her repeated and consistent performance deficiencies culminating with her failed PIP.  *See, e.g., Stockman v. Oakcrest Dental Ctr.,*

*P.C.*, 480 F.3d 791, 802 (6th Cir. 2007) ("Poor performance is a legitimate, non-discriminatory reason for terminating an employee.").  Plaintiff distorts the legitimate nondiscriminatory reasons for her termination.  For example, Lineback raised concerns with Plaintiff about her lack of presence in the office starting in early 2007 and continuing through late 2009, just before the PIP was issued.  However, Plaintiff argues that "Lineback admits that prior to the alleged ethics complaint [in February 2010] she had not told Yates-Mattingly that she had any attendance problems which could lead to termination."  (Doc. 74 at 15).  In support of this point, Plaintiff points to Lineback's deposition testimony:

> Q. Did you tell her, prior to the PIP, that you were considering terminating her or taking any action against her?
>
> A. No.

(Doc. 64 at 43).  Contrary to Plaintiff's assertion, this testimony is significantly different from Lineback not telling Plaintiff that she did not have attendance problems that could lead to termination.  Similarly, Plaintiff's argument regarding the purported lack of coaching and warnings is contradicted by evidence of Lineback's extensive verbal counseling.  (Doc. 64 at 194-99, Ex. 22).

What Plaintiff characterizes as "shifting explanations" for the termination decision are all actually part of her violation of the PIP.  A plaintiff cannot establish shifting explanations through "semantic nitpicking."  *Mann v. Navicor Group, LLC*, No. 11-4028, 2012 U.S. App. LEXIS 14978, at *8 (6th Cir. July 19, 2012).  Moreover, whereas shifting

explanations for termination may raise questions of pretext, additional reasons for termination, which are consistent with the original explanation, do not raise issues of pretext.  *MacDonald-Bass v. JE Johnson Contracting, Inc*., No. 10-2318, 2012 U.S. App. LEXIS 17264 (6th Cir. Aug. 13, 2012).

Plaintiff repeatedly misstates the purposes for and requirements of the PIP.  The PIP did not say Plaintiff could never take time off work or that Plaintiff could not show up late for work when she did not feel well.  To the contrary, the PIP stated that Plaintiff was required to: (1) "work expected hours from 8:00 a.m.-5:00 p.m."; and (2) "[n]otify supervisor within one-half hour if anticipating late arrival or need to leave early; if supervisor is unavailable, leave voice message and call supervisor's assistant."  (Doc. 61, Ex. QQ).  Plaintiff failed to do these things.[31]

Plaintiff also improperly states that her interpersonal communications issues included in the PIP had "resolved" prior to the PIP being issued.  (Doc. 74 at 2, 31, 34). The focus of the PIP became Plaintiff's failure to work during designated hours and to properly report leave time when she was not present during those hours.  However, nothing in the record indicates that Plaintiff's relationships with coworkers, students, or

---

[31]  Plaintiff's failures to properly fill out her sick and vacation log are also part of the PIP violation.  Lineback testified that she had no problem with Plaintiff coming in to work late for a permissible purpose: "If she needed to have time off, I didn't have a problem with that.  What I needed was accurate documentation on her time and vacation log."  (Doc. 64 at 14).

faculty had improved between March 18, 2010 and June 14, 2010.[32]  Over a span of more

than two years, Lineback counseled and warned Plaintiff, in detail, regarding her

deficiencies and failures.  Plaintiff's failures only continued during the PIP.

Accordingly, the record supports Defendant's contention that Plaintiff was

terminated due to her failure to comply with the PIP.  Plaintiff failed to present any

evidence that her termination was for any reason other than her failure to meet clear PIP

objectives.

### D.  Plaintiff's Motion to Strike

Federal Rule of Civil Procedure 56 requires that all evidence relied upon in

moving for summary judgment be admissible at trial.  *Villegas v. Metro. Gov't of*

*Nashville*, 709 F.3d 563, 576 n. 7 (6th Cir. 2013).  Plaintiff argues that Defendant's

summary judgment motion relies on inadmissible evidence that should be stricken from

the record.

#### *1.  Alleged favoritism of certain Caucasian employees*

First, Plaintiff argues that deposition testimony provided by Sandra Parker

regarding comments that other individuals made about Defendant Lineback are

inadmissible hearsay.  However, Fed. R. Evid. 803(21) provides that among the types of

evidence that are not excluded by the hearsay rule are "Reputation Concerning Character.

---

[32]  Plaintiff focuses in large part on her medical conditions.  However, Plaintiff did not seek or obtain FMLA leave for migraines until spring of 2010, well into her PIP.  The issue regarding Plaintiff's absences was not her ability to take time off when she needed, but rather her inability to follow the PIP notification procedures and document her time accurately on her sick and vacation logs.

A reputation among a person's associates or in the community concerning the person's character."[33]

The testimony in question involves: (1) Deborah Herrick's comments to Parker that Lineback favored certain Caucasian coworkers who were referred to as her "team of fair haired children" and (2) Helen Kegler's comments to Parker that Lineback preferred Caucasian employees.  Both categories involve statements regarding Lineback's reputation among work associates pertaining to her character.  Contrary to Plaintiff's assertion otherwise, the individuals who made the statements were not making them based on rumor or speculation; both Kegler and Herrick had worked directly under Lineback for extended periods.  Accordingly, these statements are not hearsay and are admissible with respect to whether Lineback was the "unusual employer" who discriminated against Caucasians.  Moreover, even if the Court were to strike this testimony, Plaintiff's *prima facie* case for race discrimination would still fail.

### 2. Ethics complaint

Plaintiff also moves the Court to strike as hearsay Lineback's statements that Karen Faaborg, University of Cincinnati's former Senior Associate Vice President and Chief Human Resources Officer, informed Lineback of an ethics complaint about Plaintiff.  Defendant has remedied this objection by filing Faaborg's affidavit.  (*See* Doc. 80, Ex. 2).  Moreover, even if the Court were to strike this testimony, Plaintiff fails to state a *prima facie* case.

---

[33] In *Blackburn v. United Parcel Service, Inc.*, 179 F.3d 81, 99 (3rd Cir. 1999), the court clarified that the term "associates" within Fed. R. Evid. 803(21) includes work associates.

### 3.  Whether Herrick's testimony is inadmissible as a legal conclusion

Next, Plaintiff asks the Court to strike Herrick's testimony as an inadmissible legal conclusion.  Specifically, Defendant objects to the following testimony:

> Q.     Do you believe Pam Lineback discriminates against individuals because they're Caucasian?
>
> A.     No.

(Doc. 68 at 48).   Under Federal Rule of Evidence 704, testimony in the form of an opinion or inference, if otherwise admissible, is not objectionable simply because it embraces an ultimate issue to be decided by the trier of fact.  Federal Rule of Evidence 701 allows lay witness opinion testimony when it is rationally based on the perception of the witness, helpful to a clear understanding of the witness's testimony, and not expert testimony.

Herrick was initially hired at UC in September 1977 and has worked full time at the University since 1989.  (Doc. 68 at 14-15).  Herrick's testimony was based on her perception of Lineback over a lengthy career with the University and is helpful in generally understanding the conditions at UC and Lineback.  Thus, the testimony is admissible.[34]

---

[34]  Plaintiff cites *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985), to support her position that this testimony should be stricken.  However, in *Torres*, the court determined that the problem with the testimony relevant to that case was that it conveyed "unexpressed, and perhaps erroneous, legal standards to the jury." *Id.* at 150.  It was the potential effect on the jury which led the court to find that the question addressed an improper legal conclusion, albeit ultimately harmless error.  However, there is no potential for jury prejudice here, because Herrick does not express an erroneous legal standard.  Herrick's testimony is based on her personal knowledge and experience over a 30 year career.

Moreover, even if the Court were to strike this testimony, Plaintiff fails to state a *prima facie* case.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons, Plaintiff's motion to strike (Doc. 77) is **DENIED**, and Defendant's motion for summary judgment (Doc. 70) is **GRANTED**, as there is no genuine dispute as to any material fact, and Defendant is entitled to judgment as a matter of law.  The Clerk shall enter judgment accordingly, whereupon this case is **CLOSED**.

**IT IS SO ORDERED**.

Date:  8/1/13                                              */s/ Timothy S. Black*
                                                      Timothy S. Black
                                                      United States District Judge